**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| PETER HUMPHREY, YU YINGZENG, and CHINAWHYS COMPANY LTD, | Civil Action No.:  2:19-CV-0375 |
| Plaintiffs, | |
| v. | |
| GLAXOSMITHKLINE PLC and GLAXOSMITHKLINE LLC, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF
GLAXOSMITHKLINE PLC AND
GLAXOSMITHKLINE LLC TO COMPEL ARBITRATION**

At its core, this lawsuit is a dispute between Peter Humphrey ("Humphrey"), Yu Yingzeng ("Yu") and their company, ChinaWhys Company Ltd. ("ChinaWhys") (collectively, "Plaintiffs") against a GSK entity, GlaxoSmithKline (China) Investment Co. Ltd.  ("GSK China")—which Plaintiffs have strategically chosen not to name—concerning a contract that was negotiated, executed and performed entirely in the People's Republic of China.  That contract contains an arbitration clause.  This is the second time that Plaintiffs have litigated the present claims in this Court, and, although the Court did not previously address the applicability of the arbitration clause, the Court's prior rulings (and those made on appeal) establish that the clause applies here.

Under the contract between Plaintiffs and GSK China—titled a "Consultancy Agreement"—Plaintiffs agreed to perform certain due diligence and investigation services on behalf of GSK China.  Plaintiffs allege in their Amended Complaint that executives of GSK China made misrepresentations to them, and that as a result of Plaintiffs' investigation activities pursuant

1

to the Consultancy Agreement, they were prosecuted and imprisoned by the Chinese government. They seek redress for harms sustained as a result of their criminal prosecution and punishment by the Chinese government and their consequent loss of business.

The mandatory arbitration provision of the Consultancy Agreement states as follows:

> This Agreement shall be governed in all respects by the laws of the People's Republic of China. *All disputes arising out of or in connection with this Agreement shall be settled through friendly consultation between both parties*. In case no settlement can be reached, *either Party may submit the dispute to the China International Economic and Trade Arbitration Commission* ("CIETAC") in Beijing for arbitration in accordance with the CIETAC rules of arbitration then in effect. *The arbitration award shall be final and binding on the Parties.*

(*See* Consultancy Agreement § 11, attached as Exhibit 1 (emphasis added).)

By choosing not to name GSK China as a party, Plaintiffs seek to avoid enforcement of that clause. However, both the Amended Complaint and prior holdings from this Court and the U.S. Court of Appeals for the Third Circuit establish that Plaintiffs' claims are subject to the mandatory arbitration clause. The Amended Complaint demonstrates that all of the Plaintiffs' alleged injuries occurred as a direct result of the investigation that they performed under the Consultancy Agreement. What is more, in Plaintiffs' prior litigation, both this Court and the Third Circuit made findings that establish the arbitration clause's applicability. For example, this Court stated that "Plaintiffs' injuries were suffered in China," and that the investigation that ultimately led to the alleged injuries "was performed pursuant to [the Consultancy Agreement.]" *Humphrey v. GlaxoSmithKline PLC,* No. 16-5925, 2017 WL 4347587, at *5 n.12, *2 n.5 (E.D. Pa. Sept. 29, 2018) (Quiñones-Alejandro, J.) ("*Humphrey I*"). The Third Circuit similarly held that "it is clear that the alleged injuries were suffered in China," and that the business relationship from which

2

those injuries arise "w[as] memorialized in a 'Consultancy Agreement,' which provides that "all disputes arising out of, or in connection to, it were subject to arbitration in China." *Humphrey v. GlaxoSmithKline PLC*, 905 F.3d 694, 697, 707 (3d Cir. 2018) ("*Humphrey II*").

The Amended Complaint is thus the second occasion on which Plaintiffs have appeared before this Court attempting to claim that the GSK Defendants should somehow be held liable for the independent decision of Chinese government officials to enforce Chinese criminal law.  It is the second time that they have attempted to foist responsibility onto the GSK Defendants for alleged misrepresentations that, on the face of the Amended Complaint (as was the case with the original complaint), are attributable to GSK China.  And it is the second time that they have attempted to artfully plead around the Consultancy Agreement to avoid the arbitration clause, even though that Agreement is their sole point of contact with any GSK-affiliated entity from which liability could conceivably arise.  In fact, their efforts are so strained that they must resort to claims of a far-flung global conspiracy—even though Plaintiffs' RICO claims have already been dismissed by this Court—in a baseless attempt to connect the GSK Defendants to the specific misrepresentations allegedly made by GSK China.

At this point, enough is enough.  Plaintiffs agreed to arbitrate these claims.  They signed the Consultancy Agreement and entered into it freely and knowingly.  It is an enforceable contract.  There is no basis not to enforce it, and at no point have Plaintiffs claimed that it is invalid.  The GSK Defendants therefore request that the Court grant this motion, stay any further proceedings, and enter an order compelling arbitration in accordance with the Consultancy Agreement's terms.

I.      **FACTUAL BACKGROUND**

   A.     **GSK China retains Plaintiffs to conduct an investigation in China, and Plaintiffs allege that they are prosecuted by Chinese law enforcement officials as a result of their investigation activities.**

Plaintiffs' Amended Complaint attempts to spin a sweeping tale of cross-border deception by the GSK Defendants and other members of their corporate family, but the well-pleaded facts actually focus narrowly on the relationship between Plaintiffs and GSK China. Humphrey and Yu are the founders and sole owners of ChinaWhys. (*See* Am. Compl. (ECF. 1-6) at C791 ¶ 8.) At all times relevant to the Amended Complaint, ChinaWhys was a China-based company that performed due diligence and investigations services for international companies engaged in business in China. (*Id.*) According to the Amended Complaint, on April 15, 2013, Humphrey and Yu met with executives of GSK China to discuss GSK China's possible retention of ChinaWhys. (*Id.* at C801 ¶ 48.) GSK China CEO Mark Reilly attended that meeting, as did April Zhao and Brian Cahill, both of whom are in-house counsel for GSK China. (*Id.* at C801 ¶ 49.) At the meeting, Reilly, Zhao, and Cahill allegedly told Humphrey and Yu that Vivian Shi, a former GSK China employee who was terminated for expense reimbursement fraud, had ties to officials within the Chinese government and had made multiple reports to those officials of alleged corruption within GSK China. (*Id.*) They allegedly described these reports as a "smear campaign" undertaken by Shi in retaliation for GSK China's decision to end her employment. (*Id.*)

Plaintiffs further allege that the GSK China executives represented that Shi had a reputation for "being 'nasty,'" "had left previous jobs under 'unhappy circumstances[,]' and had acted 'vengefully' toward her former employers." (*Id.* at C802 ¶ 50.) The GSK China executives then allegedly asked Humphrey and Yu to "'conduct a background investigation on Shi.'" (*Id.* at C803

¶ 59.)   Humphrey and Yu agreed, and Humphrey signed the Consultancy Agreement on ChinaWhys' behalf.  (*See* Ex. 1, Consultancy Agreement; Notice of Removal (ECF 1) ¶ 33.)  The Consultancy Agreement is the only contract that Plaintiffs executed with any GSK-affiliated entity, and all of the work that they claim led to their injuries was performed for GSK China  pursuant to it.  (*Id.* ¶ 34.)

As agreed under the Consultancy Agreement, ChinaWhys delivered its investigation report to Zhao and Cahill on June 6, 2013.  (*Id.* at C805 ¶ 68.)  On June 27 and 28, 2013, the Chinese police raided multiple GSK China offices around the country.  (*Id.* at C807 ¶ 79.)  Plaintiffs allege that Reilly told Humphrey that, as a result of the raid, Shi had "'read [the ChinaWhys] report and … will be coming after you.'"  (*Id.* at C808 ¶ 85.)

On July 10, 2013, Chinese police searched ChinaWhys offices and arrested Humphrey and Yu.  (*Id.* at C808 ¶ 89.)  The Amended Complaint alleges that Humphrey and Yu were subsequently tried, convicted, and sentenced for criminal conduct by a Chinese court, though it is silent regarding the nature of the crimes charged or the evidence presented to obtain conviction. (*Id.* at C809-10 ¶¶ 92-94.)  Plaintiffs simply claim that the prosecution "was procured at the behest of Shi."  (*Id.* at C810 ¶ 95.)

Humphrey and Yu were incarcerated in Chinese prison until their release on June 9, 2015 and were subsequently deported from China.  (*Id.* at C812 ¶¶ 103-04.)

**B.     Plaintiffs commence litigation against GSK PLC and GSK LLC in federal court, which dismisses their claims for lack of standing without addressing the Consultancy Agreement's arbitration clause.**

On November 15, 2016, Plaintiffs brought suit against GSK PLC and GSK LLC in this Court, alleging claims under the Racketeer Influenced and Corrupt Organization Act ("RICO"),

18 U.S.C. §§ 1961-68, as well as for fraud, intentional and negligent infliction of emotional distress, and civil conspiracy under state law. The GSK Defendants moved to compel arbitration pursuant to the Consultancy Agreement and in the alternative to dismiss those claims on multiple bases, including on the ground that the Plaintiffs lacked standing to bring a claim under RICO. *See* Docket Entry No. 19, *in Humphrey I*, No. 2:16-CV-5924 (E.D. Pa.) (filed Jan. 16, 2017). RICO requires a plaintiff to plead a domestic injury, and the GSK Defendants argued that Plaintiffs could not satisfy that requirement because their injuries occurred entirely in China. *Id.*

In ruling on the GSK Defendants' motion, this Court dismissed the action based on Plaintiffs' lack of RICO standing. This Court specifically found that Humphrey "entered into a 'Consultancy Agreement' with GSK China to investigate Shi'" and that "it is clear that Plaintiffs' investigation of Shi was performed pursuant to this agreement." *Humphrey I*, 2017 WL 4347587, at *2 & n.5. The Court held that, taking Plaintiffs' allegations as true as required by Rule 12(b)(6), "GSK China's conduct in China caused Plaintiffs' injuries," and "Plaintiffs ha[d] not alleged any facts to support that the claimed wrongful conduct occurred in the United States." *Id.* at *7. The Court therefore dismissed the RICO claims for lack of standing. *Id.* It further held that Plaintiffs had failed to establish all of the parties' citizenship for purposes of diversity jurisdiction over the state law claims and dismissed those claims as well. *Id.* at *8. This Court did not address the GSK Defendants' motion to compel arbitration.

Plaintiffs appealed the dismissal for lack of RICO standing to the U.S. Court of Appeals for the Third Circuit. They did not appeal the dismissal of the state law claims for lack of diversity jurisdiction, nor was the motion to compel arbitration implicated in the appeal. The Third Circuit affirmed the dismissal for lack of RICO standing, noting, as to GSK China, that "[t]he decision

6

not to name GSK China as a defendant is likely an attempt to downplay ties to China." *Humphrey II*, 905 F.3d at 697 n.5.  The Third Circuit held that "[t]he details of [Plaintiffs'] understanding [with GSK China] were memorialized in a 'Consultancy Agreement,'" and that "it is clear that the alleged injuries were suffered in China."  *Id.* at 697, 707.  Most notably, it found that Plaintiffs "entered into the Consultancy Agreement in China and agreed to have Chinese law govern it," and that "it would be odd to permit Plaintiffs to seek civil redress for alleged harm arising from the very crimes they were convicted of in China and that arose from China's application of its own criminal laws."[2] *Id.* at 707, 708.

On October 24, 2018, following the Third Circuit's affirmance, Plaintiffs transferred their original complaint to the Philadelphia Court of Common Pleas pursuant to 42 Pa. C.S. § 5103(b), which allows cases dismissed in federal court to be instituted in state court.  (*See* Notice of Removal (ECF 1) ¶ 6.)  They served GSK LLC in the new state court matter on October 26, 2018.  (*Id.* ¶ 12.)  GSK PLC, however, was not served until January 2, 2019.  (*Id.* ¶ 13.)  On December 17, 2018, they filed the Amended Complaint in state court.  (*Id.* ¶ 18.)

On January 25, 2019, the GSK Defendants removed Plaintiffs' state court complaint to this Court for the purposes of seeking an order compelling arbitration under the United Nations New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, Dec. 29, 1970, 21 U.S.T. 2517 ("the New York Convention"), and its implementing federal statute, Chapter 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201-08.

---

[2] The Third Circuit's findings were integral to its decision on appeal and therefore constitute law of the case for purposes of this continuation of the proceeding.  *See Spock v. David*, 502 F.2d 953, 955 (3d Cir. 1974) (noting that both the district court and a subsequent appellate panel are bound by determinations previously made on appeal "on essentially the same record" as was previously at issue), *rev'd on other grounds, Greer v. Spock*, 424 U.S. 828 (1976).

**C.      The Consultancy Agreement contains a mandatory arbitration clause that is enforceable against ChinaWhys, Humphrey, and Yu.**

This Court previously found "that Plaintiffs' investigation of Shi was performed pursuant to [the Consultancy A]greement," which is  the only basis for the performance of the services that Plaintiffs allege resulted in their injuries.  *Humphrey I*, 2017 WL 4347587, at *2 n.5.  Plaintiffs have never been retained by any GSK-affiliated entity other than GSK China, and the Consultancy Agreement is the only engagement that Plaintiffs ever performed for that entity.[3]  (*See* Notice of Removal (ECF 1) ¶¶ 34, 47.)  Section 11 of the Consultancy Agreement mandates arbitration of all disputes arising out of or in connection with the agreement as follows:

> This Agreement shall be governed in all respects by the laws of the Peoples Republic of China.  All disputes arising out of or in connection to this Agreement shall be settled through friendly consultation between both parties.  In case no settlement can be reached, either party may submit the dispute to the China International Economic and Trade Commission ("CIETAC") in Beijing for arbitration in accordance with the CIETAC rules of arbitration then in effect.  *The arbitration award shall be final and binding on the parties.*

(*See* Ex. 1, Consultancy Agreement § 11 (emphasis added).)

The only GSK-related party to the Consultancy Agreement was GSK China, a wholly-owned indirect subsidiary of GSK PLC. (*See* Notice of Removal (ECF 1) ¶¶ 2, 50.)  The Consultancy Agreement consists of two parts, a cover agreement negotiated by the parties and a project proposal *drafted by Humphrey* that was incorporated into and made part of the cover

---

[3] Under the New York Convention, the Court may consider facts set forth in the Notice of Removal in addition to those pleaded in the complaint:  "The procedure for removal of causes otherwise provided by law shall apply, except that the ground for removal … need not appear on the face of the complaint but may be shown in the petition for removal."  9 U.S.C. § 205.  In any event, the Consultancy Agreement is integral to Plaintiffs' allegations in the Amended Complaint, just as it was integral to the allegations in the original complaint.

agreement.   (*See* Ex. 1, Consultancy Agreement § 1.1.)   The cover agreement identifies its signatories as GSK China and an entity called ChinaWhys (Shanghai) Consulting Co. Ltd. ("ChinaWhys (Shanghai)").

ChinaWhys (Shanghai) is indistinguishable from ChinaWhys Ltd., the named plaintiff here.   The project proposal prepared by Humphrey and incorporated into the Consultancy Agreement was printed on ChinaWhys (Shanghai) letterhead but states that Humphrey drafted it "[f]urther to the recent contacts between [GSK China] and ChinaWhys Co Ltd ('ChinaWhys')." (*Id.* at App'x.)   Humphrey signed the project proposal as "Managing Director" of ChinaWhys, which is defined as the entity that is the Plaintiff here.   (*Id.*)   The investigation report prepared by Humphrey and Yu under the Consultancy Agreement likewise represents that it was prepared by the ChinaWhys entity named as a plaintiff in the Amended Complaint: "[t]his report was produced by ChinaWhys Company Limited ('ChinaWhys') at the request of [GSK China.]"   (*See* Notice of Removal (ECF 1) ¶ 45.)

When communicating with GSK China in connection with Consultancy Agreement, Humphrey did so from a chinawhys.com email address that identified him as the "Founder & Managing Director, ChinaWhys Co. Ltd."   (*See* Humphrey Email (June 6, 2018), attached as Exhibit 2.)   Even the ChinaWhys website fails to distinguish ChinaWhys Ltd (the named Plaintiff) and any other ChinaWhys-branded entity, instead stating simply that Humphrey and Yu are the co-founders of "ChinaWhys," which provides "advice to the business community on risk management and conducted services in China."   (*See* ChinaWhys Website, attached as Exhibit 3.)

In sum, there is no—and never was any—meaningful distinction between ChinaWhys (Shanghai) (the entity listed on the front of the Consultancy Agreement) and ChinaWhys Co. Ltd

9

(the plaintiff entity in whose name Humphrey executed the project proposal incorporated into the Agreement and carried out the Agreement).  Those entities were interchangeable for Humphrey and Yu.

## II.    STANDARD OF REVIEW

The arbitration of disputes involving non-U.S. citizens or foreign commercial relationships is governed by the New York Convention, through its implementing federal legislation, Chapter 2 of the Federal Arbitration Act ("FAA").  The FAA grants federal courts jurisdiction to determine the enforceability of an arbitration clause in a contract to which a non-U.S. citizen is a party or that "has some other reasonable relation with one or more foreign states."  9 U.S.C. § 202; *see also id.* §§ 203, 205.  The Third Circuit has articulated the following standard of review for motions to compel arbitration not governed by the New York Convention:  "[W]hen it is apparent, based on the face of the complaint, and documents relied upon in the complaint, that certain of a party's claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay."[4]  *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 776 (3d Cir. 2013).  The same standard applies to motions brought under the New York Convention, with one significant caveat in removal cases contained in Section 205 of the FAA:  "the ground for removal [i.e., the showing of arbitrability] … need not appear on the face of the complaint but may be shown in the petition for removal."  9 U.S.C. § 205.  "[Section] 205 … overrides the well-pleaded complaint rule *pro tanto.*"  *Vaden v. Discover*

---

[4] If the parties present evidence raising a genuine issue of material fact regarding the existence of an agreement to arbitrate, the evidence should be reviewed under the summary judgment standard.  *Guidotti*, 716 F.3d at 776.  That standard does not apply here, as the facts set forth in the Amended Complaint, the Notice of Removal, and the relevant evidence all demonstrate that the arbitration provision of the Consultancy Agreement applies to Plaintiffs' claims.

*Bank*, 556 U.S. 49, 59 n.9 (2009).  It allows the Court to rely on both the facts set forth in the Amended Complaint and in the Notice of Removal when addressing the question of arbitrability. *Silec Cable S.A.S. v. Alcoa Fjardaal, SF*, No. 12-1392, 2012 WL 5906535, at *6 (W.D. Pa. Nov. 26, 2012)*.

## III.  <u>ARGUMENT</u>

"[T]he FAA, of which the [New York] Convention is a part, establishes a strong federal policy in favor of arbitration[,] and … the presumption in favor of arbitration carries 'special force' when international commerce is involved." *China Minmetal Material Import & Export Co. v. Chi Mei Corp.*, 334 F.3d 274, 281 (3d Cir. 2003) (quoting *sandvik v. Advent Int'l Corp.*, 220 F.3d 99, 104 (3d Cir. 2000)).  A "written provision in a … commercial contract showing an agreement to settle disputes by arbitration 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist in law or equity for the revocation of any contract.'" *Just B. Method, LLC v. BSCPS, LP*, No. 14-1516, 2014 WL 5285634, at *4 (E.D. Pa. Oct. 14, 2014) (Quiñones-Alejandro, J.) (*quoting Century Indem. Co. v. Certain Underwriters at Lloyd's London*, 584 F.3d 513, 522 (3d Cir. 2009) and 9 U.S.C. § 2)).  Under Chapter 2 of the FAA, a court will enforce agreements to arbitrate "if they arise from commercial, legal relationships, such as commercial contracts, except when those relationships are entirely between United States citizens and otherwise are domestic in nature."[5] *Century Indem. Co.*, 584 F.3d at 523 (*citing* 9 U.S.C. § 202).  Together, the FAA and the New York Convention recognize an "emphatic federal policy in favor of arbitral dispute resolution." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985).

---

[5] The domestic FAA applies to actions brought under the New York Convention to the extent that the two are not in conflict. 9 U.S.C. § 208.

11

When a court is requested to compel arbitration under the New York Convention, it must

consider the following four factors, adopted by the U.S. Court of Appeals for the Third Circuit in

*Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440 (3d Cir. 2003):

(1)     Is there "an agreement in writing to arbitrate the subject of the dispute?"

(2)     "Does the agreement provide for arbitration in the territory of a signatory of the Convention?"

(3)     "Does the agreement arise out of a legal relationship, whether contractual or not, which is considered as commercial?"

(4)     "Is a party to the agreement not an American citizen, or does the commercial relationship have some reasonable relation with one or more foreign states?"

*Standard Bent Glass*, 333 F.3d at 449 & n.13; *accord Century Indem. Co*., 584 F.3d at 523 n.8.

"If the answers are all in the affirmative, the court must order arbitration unless it determines the

agreement is null and void."  *Standard Bent Glass*, 333 F.3d at 449 & n.13.  The *Standard Bent

Glass* factors require the Court to compel arbitration here.

**A.     All four of the *Standard Bent Glass* factors support compelling arbitration.**

**1.     A written agreement exists between the parties to arbitrate the subject of the dispute.**

To obtain an order compelling arbitration under the New York Convention, a party must

show the existence of a written agreement to arbitrate the subject of the dispute.  *Standard Bent

Glass Corp.*, 333 F.3d at 449.  Here, it is undisputed that the Consultancy Agreement is a written

agreement signed by Humphrey on behalf of ChinaWhys and by GSK China.  Section 11 of the

Consultancy Agreement specifically states that "[a]ll disputes arising out of or in connection with"

the agreement are subject to arbitration.  (Ex. 1, Consultancy Agreement § 11.)  Clauses using this

same or similar broad formulations give rise to "a presumption of arbitrability" under which

arbitration "*should not be denied unless it may be said with positive assurance that the arbitration*

12

*clause is not susceptible of an interpretation that covers the asserted dispute.*"  *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983) (emphasis added); *see also Hinnant v. Am. Ingenuity, LLC*, 554 F. Supp. 2d 576, 587 (E.D. Pa. 2008) (holding that a clause providing for arbitration of "all disputes in connection with this contract" created a broad presumption of arbitrability).

Plaintiffs cannot meet the exacting standard for denial of arbitration because all claims Plaintiffs allege ultimately arise out of or are connected to the Consultancy Agreement. According to the Amended Complaint, Plaintiffs were retained by GSK China following a meeting with GSK China's representatives.  (*See* Am. Compl. (ECF 1-6) at C803 ¶ 59-60.)  That meeting produced the Consultancy Agreement, which provided for due diligence and investigative services specifically including inquiries into Shi (*See* Ex.1, Consultancy Agreement § 1.1.) Plaintiffs' efforts to carry out their duties under the Consultancy Agreement are the only activities they claim to have performed for (or in any way relating to) any GSK entity.  (Notice of Removal (ECF 1) ¶ 34.)  As such, any claims Plaintiffs could conceivably assert in this case necessarily arise out of or relate to the Consultancy Agreement.

Plaintiffs' effort to style their claims as torts under state law does not abrogate the arbitrability of those claims. As the Third Circuit has recognized: "'If the allegations underlying the claims touch matters covered by [an arbitration clause in a contract], then those claims must be arbitrated, whatever the legal labels attached to them.'" *Brayman Const. Corp. v. Home Ins. Co.*, 319 F.3d 622, 626 (3d Cir. 2003) (alteration in original) (*quoting Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir. 1987)).  The *Genesco* case upon which the Third Circuit relied in reaching that conclusion expressly found that fraud and other tort claims "have long been held

13

to be arbitrable as a matter of law." *Genesco*, 815 F.2d at 848; *accord Edwards v. Hovensa LLC*, 497 F.3d 355, 264 (3d Cir. 2007) (holding that a clause requiring arbitration of personal injury tort claims was not unconscionable).  The same is true here.

As set forth in the Amended Complaint, the fraud and tort claims asserted by Plaintiffs allegedly were the result of GSK China's representations to Plaintiffs when requesting that they "create a dossier on … Shi."  (*See* Am. Compl. (ECF 1-6) at C789 ¶ 2.)  The activities that Plaintiffs performed under the Consultancy Agreement allegedly led to the injuries that they claim to have suffered at the hands of Chinese government officials.[6]  In fact, in *Humphrey II* the Third Circuit specifically found  that "ChinaWhys agreed to conduct a background investigation on Shi," 905 F.3d at 697; that "[t]he details of that understanding were memorialized in a 'Consultancy Agreement,'" *id*.; and that "it is clear that the alleged injuries were suffered in China" as a result of that investigation," *id.* at 707.  This Court likewise observed that "it is clear that Plaintiffs' investigation of Shi was performed pursuant to [the Consultancy A]greement."  *Humphrey I*, 2017 WL 4347587, at *2 n.5.  Each of those findings was essential to the decisions issued by this Court and the Third Circuit during the prior litigation, and thus constitute law of the case that Plaintiffs are precluded from contesting in the current proceeding.  *See Hamilton v. Leavy*, 322 F.3d 776, 786 (3d Cir. 2003) ("The law of the case doctrine limits relitigation of an issue once it has been decided in an earlier stage of the same litigation.")  The present dispute therefore "aris[es] out of

---

[6] Defendants note that, although all of Plaintiffs' alleged injuries flow from their criminal prosecution by Chinese government authorities, the Consultancy Agreement expressly required Plaintiffs to "comply fully at all times with all applicable laws and regulations, including but not limited to anti-corruption laws, of the territory in which you conduct business with GSK [i.e., GlaxoSmithKline (China) Investment Co., Limited]."  (Ex. 1, Consultancy Agreement § 18.2.)

or in connection with" that Consultancy Agreement and is subject to its broad arbitration provision. (*See* Ex. 1, Consultancy Agreement § 11.)

The arbitration clause is mandatory.  It provides that any disputes "*shall* be settled through friendly consultation," and that "[i]n case no settlement can be reached, either party may submit the dispute to [CIETAC] in Beijing for arbitration in accordance with the CIETAC rules of arbitration then in effect.  *The arbitration award shall be final and binding on the parties.*"  (*Id.*) Although it states that, following consultation, disputes *may* be submitted to CIETAC, the final and binding nature of CIETAC's determination emphasizes that the clause is, in fact, mandatory. Moreover, "[t]he use of the permissive 'may' is not sufficient to overcome the presumption that parties are not free to avoid [a] contract's arbitration procedures."  *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 204 n.1 (1985).  As one court has explained:

> [T]his Court does not distinguish between the use of the term "may" or "shall" in the arbitration context.  Instead, we generally recognize that the language permitting either party to demand arbitration operates to require the parties to submit to arbitration, as it clearly demonstrates that the parties contemplated the use of arbitration proceedings as the forum for resolution of disputes.

*D & H Distrib. Co. v. Nat'l Union Fire Ins.*, 817 A.2d 1164, 1169 (Pa. Super. Ct. 2003).  This Court too has "rejected … argument[s] that the use of the word 'may' automatically renders an arbitration clause permissive."  *Brown v. City of Philadelphia*, No. 10-2687, 2010 WL 4484630, at *5 (E.D. Pa. Nov. 9, 2010).  Under the prevailing interpretation, "arbitration clauses using the word 'may' have been held to compel mandatory arbitration on the grounds that such language merely manifests the parties' intent that arbitration be obligatory if either party so chooses."  *Id.*; *see also American Italian Pasta Co. v. Austin Co.*, 914 F.2d 1103, 1104 (8th Cir. 1990); *Sidorek*

*v. Chesapeake Appalachia LLC*, 3:13-CV-0208, 2014 WL 1218893, at *3 (M.D. Pa. Mar. 24, 2014).

The same rationale applies here.  The provision in the Consultancy Agreement that "either Party may submit the dispute" to arbitration evinces an intent that a demand for arbitration will be binding once made by either party.  *Brown*, 2010 WL 4484630, at *5; *Sidorek*, 2014 WL 1218893, at *3.  The mandatory nature of the "friendly consultation" requirement bolsters that conclusion. There would be little reason for the parties to agree to a mandatory conciliation process, but immediately thereafter provide a purely optional arbitration provision that neither party could compel the other to follow.  Were that the case, the arbitration provision would be of no effect, as it would merely suggest that the dispute could be submitted to arbitration if the parties agreed to do so after the dispute arose—an avenue that they could pursue without an arbitration clause.  *See United States v. Bankers Ins. Co.*, 245 F.3d 315, 321 (4th Cir. 2001) (holding that interpreting "may" as permissive in the arbitration context "would render the arbitration provision meaningless for all practical purposes[,] since parties could always voluntarily submit [ ] to arbitration.") (alterations in original; internal quotations omitted). The far more likely scenario is that, "by using the word 'may,' both parties were given the power to enforce the arbitration clause." *In re Winstar Commc'ns*, 335 B.R. 556, 563 (Bankr. D. Del. 2005); *see also United Steelworkers of Am., v. Ft. Pitt Steel Casting,* 598 F.2d 1273, 1279 n.18 (3d Cir. 1979) (finding that the district court did not err in holding that grievance procedures in a collective bargaining agreement were "mandatory despite language in the collective bargaining agreement that the parties 'may' invoke those procedures.").

The present dispute therefore falls within the scope of the Consultancy Agreement's mandatory arbitration provision.  The first *Standard Bent Glass* factor is met.

### 2.    The Consultancy Agreement provides for arbitration in the territory of a signatory state.

To obtain an order compelling arbitration under the New York Convention, a party must next demonstrate that the agreement at issue provides for arbitration in a signatory state. *Standard Bent Glass Corp.*, 333 F.3d at 449 n.13.   Both the U.S. and China are signatories to the Convention. *See* New York Arbitration Convention, Contracting States, *available at* http://www.newyorkconvention.org/countries (last visited January 16, 2019).  The Consultancy Agreement specifically provides for "either Party" to "submit the dispute to [CIETAC] in Beijing."  (*See* Ex. 1, Consultancy Agreement  § 11.)

The Consultancy Agreement provides for arbitration in the territory of a signatory state, and therefore the second *Standard Bent Glass* factor is met.

### 3.    The Consultancy Agreement sets forth a legal relationship that is considered commercial.

Next, the Court must consider whether the agreement at issue "arise[s] out of a legal relationship … which is considered as commercial." *Standard Bent Glass Corp.*, 333 F.3d at 449 n.13.  In the international arbitration context, courts have broadly construed the term "commercial" to apply to any matter that "'has a connection with commerce, whether or not that commerce has a nexus with the United States.'"  *Belize Social Dev. Ltd. v. Gov't of Belize*, 794 F.3d 99, 104 (D.C. Cir. 2015) (*quoting* Restatement (Third) of U.S. Law of Int'l Comm. Arbitration § 1-1 cmt. e); *accord  Island Territory of Curacao v. Solitron Devices, Inc.*, 356 F. Supp. 1, 13 (S.D.N.Y. 1973)

17

("[I]t seems clear that the full scope of 'commerce' and 'foreign commerce,' as those terms have been broadly interpreted, is available for arbitral agreements and awards.").

The Consultancy Agreement is a written document setting forth a legal relationship that addresses a commercial matter.  It is a binding legal agreement between the signatories, and creates a contractual relationship under which ChinaWhys agreed to render professional services to GSK China.  It contains provisions that outline the parameters of their work and specifies the terms and conditions under which they were to be paid.  In fact, the Third Circuit found that, "at all relevant times, Plaintiffs … had their principal place of business in China [and] provided services in China…." *Humphrey II*, 905 F.3d at 707.  This Court too has found that "companies came to Plaintiffs when they sought to do business in China." *Humphrey I*, 2017 WL 4347587, at *6.  In other words, by its very nature ChinaWhys was involved in a commercial undertaking of which the Consultancy Agreement is one example.  As such, the Consultancy Agreement embodies a legal relationship addressing a commercial arrangement between its signatories.  It touches on a matter "considered as commercial" for purposes of the New York Convention.  *Standard Bent Glass Corp.*, 333 F.3d at 449 n.13.  The third *Standard Bent Glass* factor is met.

### 4.    Neither of the parties to the Consultancy Agreement is an American citizen, and the Agreement bears a reasonable relationship with a foreign state.

Finally, the Court must determine whether a non-American is a signatory to the agreement at issue, or whether there is "some reasonable relation with one or more foreign states." *Standard Bent Glass Corp.*, 333 F.3d at 449 n.13.  Although only one of those characteristics is needed to compel arbitration, the Consultancy Agreement features both.  *Id.*  Neither party to the Consultancy Agreement is an American citizen.  GSK China is incorporated under Chinese law, maintains its

principal place of business in Shanghai, and operates exclusively in China.  (*See* Notice of

Removal (ECF 1) ¶¶ 27.)  ChinaWhys is formed under the laws of Hong Kong.  (*Id.* ¶ 24.)  More

importantly, it is clear that China is the *only* country with which the Consultancy Agreement bears

any reasonable relationship.  As the Third Circuit found during the previous federal litigation:

> [I]t is clear that the alleged injuries were suffered in China.  As the
> District Court noted, at all relevant times, Plaintiffs lived in China;
> had their principal place of business in China; provided services in
> China (albeit to some American companies—but even they were
> operating in China); entered the Consultancy Agreement in China
> and agreed to have Chinese law govern it; met with Defendants'
> representatives only in China; and themselves indicated on the civil
> cover sheet that the underlying incident arose in China.
> "[C]ompanies came to [ChinaWhys] when they sought to do
> business in China."

*Humphrey II*, 905 F.3d at 707-08 (quoting *Humphrey I*, 2017 WL 4347587, at *6).  In short, the

entire Consultancy Agreement was directed at China, and concerned services performed in China.

Those services allegedly produced the China-based harms that Plaintiffs describe in the Amended

Complaint.  The Consultancy Agreement bears more than a reasonable relationship to a foreign

state, specifically China, and therefore the fourth and final *Standard Bent Glass* factor is met.

Accordingly, all four of the *Standard Bent Glass* factors are met.  "[T]he court must

[therefore] order arbitration," as there is no basis to conclude that the Agreement is null and void.

*Standard Bent Glass*, 333 F.3d at 449 & n.13.  The Court should issue an order staying further

judicial proceedings and compelling arbitration in accordance with the FAA and the New York

Convention.[7]

---

[7] Although Plaintiffs were deported from China, CIETAC remains an available forum to
hear their claims.  CIETAC rules allow a party to appear through a representative at arbitration
proceedings.  CIETAC Arb. R. art. 20.  They also allow parties to participate in proceedings via
videoconference, or to request that a matter be heard on the papers.  *See* CIETAC Online Arb. R.

**B.** **The arbitration clause may be enforced as to all parties to the present litigation.**

    **1.** **GSK PLC and GSK LLC are entitled to invoke the arbitration clause in the Consultancy Agreement.**

Even though GSK PLC and GSK LLC are not direct signatories to the Consultancy Agreement, they are nonetheless entitled to invoke its arbitration provision. An arbitration clause may be enforced by a nonsignatory if a "close relationship" exists between the entities involved and if "the claims were intimately founded in and intertwined with the underlying contract obligations." *E.I. DuPont de Nemours*, 269 F.3d at 199. In essence, when a claim arises by or against one member of a corporate family by virtue of a related company's contract, the non-signatory may invoke an arbitration provision in that contract. *Id.*; *see also Bannett v. Hankin*, 304 F. Supp. 2d 354, 359 (E.D. Pa. 2004) ("[N]onsignatories to an arbitration agreement have standing to compel arbitration against a signatory and the signatory is estopped from avoiding arbitration with a nonsignatory when the issues which the nonsignatory wants to resolve are intertwined with the agreement that the signatory signed.").

Here, Plaintiffs' claims against GSK PLC and GSK LLC allegedly arose while Plaintiffs were carrying out their investigatory obligations under the Consultancy Agreement with GSK China. (Am. Compl. (ECF 1-6) C801-05 ¶¶ 47-68.) Plaintiffs performed no other services for any GSK-affiliated entity except those provided to GSK China under the terms of the Consultancy Agreement. (Notice of Removal (ECF 1) ¶ 34.) Put differently, although Plaintiffs

---

art. 33; CIETAC Arb. R. art. 33(2). Appearance through a representative or video conference does not alter the party's rights to participate in the proceeding, present evidence, or call witnesses. Thus, arbitration before CIETAC—as contractually agreed between Plaintiffs and GSK China—remains available to hear Plaintiffs' claims.

have elected not to sue GSK China, the *only* conceivable avenue by which they could ascribe

liability to either GSK PLC or GSK LLC is through the work that Plaintiffs performed for GSK

China under the Consultancy Agreement.  Their claims are thus "intimately founded in and

intertwined with" the Consultancy Agreement such that GSK PLC and GLK LLC may assume

standing to enforce the arbitration provision of that contract.  *E.I. DuPont de Nemours*, 269 F.3d

at 199.  Plaintiffs must, therefore, bring their claims arising from the Consultancy Agreement in

an arbitration tribunal regardless of which GSK corporate entities they attempt to pursue as

defendants.

> **2.      The Court may require Humphrey, Yu, and ChinaWhys to arbitrate
> their claims due to their affiliation with Chinawhys (Shanghai), which
> is the signatory to the Consultancy Agreement.**

The Court may compel the Plaintiffs to arbitrate even though the Consultancy Agreement

was signed only by Humphrey on behalf of ChinaWhys (Shanghai).  "Because arbitration is a

creature of contract law, when asked to enforce an arbitration agreement against a non-signatory

to the contract, a district court must determine whether the non-signatory individual 'is bound by

that agreement under traditional principles of contract and agency law.'" *Just B. Method*, 2014 WL

5285634, at \*7 (*quoting E.I. DuPont*, 269 F.3d at 194-95).  Under those principles, a party may be

compelled to arbitrate under principles of (1) incorporation by reference, (2) assumption of

contractual rights or obligations, (3) agency, (4) alter ego, and (5) estoppel. *Allstate Settlement

Corp. v. Rapid Settlements, Ltd.*, 559 F.3d 164, 170 (3d Cir. 2009).

> *a.      The consultancy agreement binds Humphrey and Yu under
> principles of agency and estoppel.*

Under agency principles, when a contract signatory retains another individual or entity as

an agent to carry out its contractual obligations, claims accruing as a result of the agent's conduct

are subject to any arbitration provision contained in the contract. *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1121 (3d Cir. 1993).  Both this Court and the Third Circuit have already held that Humphrey and Yu's investigation was performed pursuant to the Consultancy Agreement. *Humphrey I*, 2017 WL 4347587, at *2 & n.5; *Humphrey II*, 905 F.3d at 697.  The Amended Complaint confirms the accuracy of those holdings.  It alleges that Humphrey and Yu are co-founders of ChinaWhys (Shanghai), the signatory to the Consultancy Agreement, and that both Humphrey and Yu met with GSK China personnel and were personally involved in the retention of ChinaWhys.  (*See* Am. Compl. (ECF 1-6) C791 ¶¶ 6-8, C803 ¶ 59.)  Indeed, both "Humphrey and Yu offered to investigate the whistleblower allegations," and Humphrey personally signed the Consultancy Agreement.  (*Id.* at C803 ¶ 59; Ex. 1, Consultancy Agreement.)  The Amended Complaint further alleges that Humphrey and Yu were introduced to GSK China by a former ChinaWhys client based on the specialized consulting services ChinaWhys provides.  (*Id.* at C801 ¶ 47.)  The Amended Complaint confirms as well that Humphrey and Yu acted on ChinaWhys' behalf.  (*Id.* at C791, C804 ¶¶ 6, 61.)  The investigation performed by Humphrey and Yu is the same as that described in the scope of work outlined in ChinaWhys' project proposal.  (*See* Ex. 1, Consultancy Agreement App'x A.)  Accordingly, Humphrey and Yu were acting as agents of ChinaWhys with regard to the facts alleged in the Amended Complaint, and they are bound by the arbitration clause in the Consultancy Agreement.

Humphrey and Yu are also bound by the arbitration clause in the Consultancy Agreement under an equitable estoppel theory.  A non-signatory to a contract may be bound by a contractual arbitration provision "if the non-signatory exploits the agreement containing the arbitration clause despite never having signed the agreement." *E.I. DuPont de Nemours*, 269 F.3d at 200.  This

22

Court has recognized that, when an individual litigant "s[eeks] to reap the full benefits of [an] Agreement" executed by an entity of which the litigant is a principal, the individual may be compelled to arbitrate claims arising under that agreement. *See Just B Method*, 2014 WL 5285634, at *9. Here, Humphrey personally signed the Consultancy Agreement. The Amended Complaint alleges that both Humphrey and Yu were "asked … to investigate Vivian Shi," both of them "agree[d] to conduct the initial investigation," and both "justifiably and directly relied" on representations made by GSK China. (*See* Am. Compl. (ECF 1-6) at C815 ¶ 121, C816 ¶¶ 124-25.) Both Humphrey and Yu thus sought to reap the benefits for the work that was performed in China for the purpose of carrying out their obligations under the Consultancy Agreement. The Court should, therefore, compel Humphrey and Yu to arbitrate in accordance with that agreement.

**b.     *The Consultancy Agreement binds ChinaWhys under principles of alter ego, agency, and assumption of contract rights.***

Under alter ego principles, one corporate entity may be bound by an arbitration clause in a contract signed by an affiliated company when the two entities have so comingled their operations that they function as a single enterprise. *Aluminium Bahrain B.S.C. v. Dahdaleh*, 17 F. Supp. 3d 461, 471 (W.D. Pa. 2014). Similarly, under principles of assumption, one entity may be bound by an arbitration clause if its "subsequent conduct indicates that it is assuming the obligation to arbitrate." *Invista S.A.R.L.*, 625 F.3d at 85 (internal quotations omitted). Here, the Court has already made the findings on a nearly identical version of the present Amended Complaint necessary to apply the Consultancy Agreement against ChinaWhys under any of those theories. It has found that Plaintiffs "do not dispute the authenticity of the [Consultancy A]greement," that they performed their investigation "pursuant to this agreement," and that their injuries derive from that investigation. *Humphrey I*, 2017 WL 4347587, at *2 n.5, *6-7. From the Amended

23

Complaint, it is likewise apparent that Humphrey's and Yu's conduct in China was performed to satisfy ChinaWhys (Shanghai)'s obligations under the Consultancy Agreement to "initiate inquiries into [Shi] and her contacts." (*See* Ex. 1, Consultancy Agreement App'x A, at 4.)  Indeed, the Consultancy Agreement and the investigation Plaintiffs' performed under it are the only relationship that Plaintiffs (or any ChinaWhys-branded entity) had at any time with any GSK affiliate.  (Notice of Removal (ECF 1) ¶¶ 34, 47.)  The actions of Humphrey and Yu are thus attributable to ChinaWhys (Shanghai), the contract signatory, because the two ChinaWhys entities functioned as a single enterprise using the same personnel.

Alternatively, the Consultancy Agreement binds ChinaWhys under an agency theory because ChinaWhys, through its employees, was acting as the agent of ChinaWhys (Shanghai) to fulfill contractual obligations of the latter entity.  "Because a principal is bound under the terms of a valid arbitration clause, its agents, employees, and representatives are also covered under the terms of such agreements."  *Pritzker*, 7 F.3d at 1121.

Moreover, ChinaWhys' conduct reflects an intent to be bound regardless of any alter ego or agency relationship.  ChinaWhys directed its personnel in China to further the specific purpose of advancing the relationship between GSK China and ChinaWhys (Shanghai) that was created by the Consultancy Agreement.  By acting on behalf of ChinaWhys (Shanghai) to meet its contractual duties, ChinaWhys manifested its intent to be bound by the contract from which those duties arose. *See Thomson-CSF, S.A. v. Am. Arb. Ass'n*, 64 F.3d 773, 777 (2d Cir. 1995) ("In the absence of a signature, a party may be bound by an arbitration clause if its subsequent conduct indicates that it is assuming the obligation to arbitrate.").

24

In sum, the Court has ample basis to find that ChinaWhys is bound by the arbitration provisions of the Consultancy Agreement.

**IV.**    <u>**CONCLUSION**</u>

For the reasons set forth above, the arbitration provisions of the Consultancy Agreement apply to the claims raised in Plaintiffs' Amended Complaint.  The GSK Defendants respectfully request that this Court enter an order compelling arbitration in accordance with the terms of that Agreement and stay further judicial proceedings until completion of that arbitration.

Dated:  February 1, 2019

Respectfully submitted,

 */s/ Jayne A. Risk*

Jayne A. Risk
*jayne.rik@dlapiper.com*
Nathan P. Heller
*nathan.heller@dlapiper.com*
**DLA PIPER LLP (US)**
One Liberty Place
1650 Market Street, Suite 4900
Philadelphia, PA 19103
Phone: (215) 656-3300

Kurt W. Hansson
*kurthansson@paulhastings.com*
James B. Worthington
*jamesworthington@paulhastings.com*
**PAUL HASTINGS LLP**
200 Park Avenue
New York, NY 10166
Phone: (212) 318-6000
*To be Admitted Pro Hac Vice*

*Attorneys for Defendant GlaxoSmithKline LLC*
*and Specially Appearing Defendant*
*GlaxoSmithKline PLC*