To: ChinaWhys (Shanghai) Consulting Co Ltd (in Chinese 摄连咨询(上海)有限公司)

Address: 35-107 CITIC Square, 1168 Nanjing West Road, Shanghai 200041, China

Date: April 25, 2013

Dear Mr. Peter Humphrey,

**CONSULTANCY AGREEMENT (this "Agreement")**

We set out below the terms on which you have agreed to provide certain consultancy services to us with respect to the proposed investigation and inquiry activities to be detailed in the proposal for Project Scorpion ("the Project").

**1.    SERVICES**

1.1    We hereby engage you to provide the following services ("the Consultancy Services") to us and you agree to provide the Consultancy Services to us using due care and skill. The scope of Consultancy Services is detailed in the Project Proposal as attached in Appendix A hereto.

1.2    You will provide the Consultancy Services to us at such times and at such locations as we shall agree from time to time. You shall ensure that when carrying out the Services at a GSK site, you conform with all GSK's policies and procedures with regard to working conditions, safety, security and similar matters and agree at all times during the performance of the Services to comply with such reasonable requirements as may be notified to you from time to time.

1.3    You will only contact third parties in pursuance of the Consultancy Services after our express written consent that you may do so to enable us to put in place a Confidentiality Agreement with that third party if we require it. Where approval has been given to contact any third party, you will agree in advance with us what information you may disclose about the Project and our business to that third party. We may specify that you are not permitted to disclose that you are working for GlaxoSmithKline when you make any authorised contact with third parties and you agree to respect any such requirement absolutely.

1.4    You will at our request produce and submit to us a final presentation and written report of all recommendations and findings arising out of the Consultancy Services immediately prior to the termination of this Agreement.

Exhibit

1

1.5     You represent that you are under no obligation which is inconsistent with this Agreement and that you will not enter into any agreement with a third party, the terms of which may be inconsistent with this Agreement.

1.6     You shall carry out the Consulting Services always in a lawful and ethical manner. The term 'ethical' used in this policy means: in compliance with all laws, regulations, legal and professional guidelines, and in a manner not likely to result in harm to GSK's reputation or image.

**2.     COMMENCEMENT DATE**

This Agreement will commence on the signature by the authorized representative of each party and will continue, subject to the provisions of Clause 8, until the Consulting Services is completed.

**3.     FEES AND EXPENSES**

3.1     For Services actually rendered hereunder, we agree to pay you a fixed sum of [**RMB 220,000**] (exclusive any applicable business Tax or VAT) ("Service Fees"). Fifty per cent (50%) of the Service Fees will be payable within thirty (30) days of the date of your invoice, which you will submit to us during the last week of each calendar month. The payment term for subsequent invoice is 60 days. You will provide a detailed summary of the Consultancy Services provided and of the hours worked for the work period invoiced.

3.2     We will pay your reasonable round-trip travelling and living expenses from your home to the consulting site while travelling at our request subject to the provision of proper receipts.  Claims for travelling and living expenses shall be submitted by you at the end of each trip taken during which this Agreement remains in effect, and we will pay such expenses after receipt and approval thereof.  Where any travel will require you to travel to another country than your normal country of residence, express written consent from us will be required before incurring such expenditure. These out-of-pockets shall not exceed the equivalent of 15% of Service Fees.

3.3     The payments referred to in Clauses 3.1 and 3.2 are full and complete compensation for all obligations assumed under this Agreement and for all inventions, improvements, patent rights or other Intellectual Property Rights (as defined in Clause 5 below) assigned under this Agreement.

3.4 You will be responsible for all costs in respect of the fees paid under this Agreement including, without limitation, the payment for and provision of all benefits and national insurance contributions and the payment of all employment and income related taxes. You agree to indemnify us in respect of any claims by the relevant authorities against us in respect of employment or income tax or national insurance or any other costs relating to the provision of the Services hereunder.

4. **CONFIDENTIALITY**

4.1. You agree to treat as secret and confidential and will not at any time nor for any reason disclose or permit to be disclosed to any person (except in accordance with Clause 1.3 above) or otherwise make use of or permit to be made use of, any information relating to the Products(s) / Project(s) whether disclosed by us or generated by you or to any technology, technical processes, business affairs, patents or finances or any such information relating to us or to any Affiliate, supplier, customer or client of ours ("Information") where knowledge or details of the Information was received, acquired or developed by you during the period of this Agreement.

4.2 Upon termination of your appointment under this Agreement for whatever reason, you shall forthwith deliver up to us all Information which may be in your possession, custody or control and which are our or our Affiliates' property or which otherwise relate in any way to the business or affairs of us or our Affiliates and no copies of the same or any part thereof will be retained by you. Such return will not affect your obligations under Clause 4.1.

4.3 The above obligations of confidentiality and non-use shall not apply to information and data which you can show were already known to you, information and data which are or become part of the public domain through no fault of your own and information and data which are given to you by a third party who has a right to do so.

4.4 The provisions of this Clause 4 will survive termination of this Agreement.

4.5 Further, the Confidentiality Agreement already signed between us shall be deemed to form part of this Agreement.

## 5. INTELLECTUAL PROPERTY RIGHTS

5.1 You shall disclose promptly to us any inventions, improvements, derivative works or alternatives made or conceived by you, either alone or jointly with others, in the course of or as a result of the work done hereunder, or as a consequence of confidential information supplied for the purposes hereof, directly or indirectly, by us or our affiliates or agents (which, for the avoidance of doubt, shall include their directors, officers or employees). You hereby assign to us or to any Affiliates of ours, to the extent permitted by law, all Intellectual Property Rights in any work generated by you on or after the commencement of this Agreement and pursuant to this Agreement and you agree to provide all necessary assistance as we may consider necessary in order to assign such Intellectual Property Rights to us or any Affiliate of ours, including, but not limited to, the execution of such documents as may be required to file applications for and obtain Intellectual Property Rights in any country in our or our Affiliates' name.

5.2 The term "Intellectual Property Rights" means all patents, trademarks, service marks, designs (whether or not registered) and applications therefor, present and future copyright, database rights, trade secrets, domain names, rights in know-how and other rights of confidence and all other rights of a similar nature or having equivalent or similar effect to any of these which may subsist anywhere in the world.

5.3 You hereby grant (and shall procure the grant of) to us or to any of our Affiliates at our option a non-exclusive, royalty-free, world-wide, perpetual, irrevocable, assignable licence (with the right to licence freely) of all Intellectual Property Rights created prior to the commencement of this Agreement which are necessary for the receipt and use of each deliverable arising out of the Consultancy Services.

## 6. NOTICES

6.1 Any notices, payments or statements to be made under this Agreement shall be made to you at the address to which this Agreement is directed and to Mr. Peter Humphrey at the ChinaWhys address stated above, or at such other address later designated in writing by the other party for such purposes.

6.2 Any notice required by this Agreement to be given by either of us to the other will be in writing and will be served by sending it by registered mail, recorded delivery courier or delivered by hand and any receipt issued by the postal authorities or by the courier or on hand delivery will be inclusive evidence of the fact and the date of posting of any such notice.

**7. INDEPENDENT CONTRACTOR RELATIONSHIP**

You agree that you will be serving under this Agreement as an independent contractor and that the relationship of employer and employee shall not exist between you and ourselves at any time as a result of the arrangements contemplated by this Agreement.

**8. TERMINATION AND SURVIVAL TERMS**

8.1 We may by giving notice in writing to you terminate this Agreement in the event that you:

8.1.1 act in breach of any of the terms of this Agreement which in the case of a breach capable of remedy, has not been remedied by you within ten (10) days of receipt by you of a notice from us specifying the breach and requiring its remedy;

8.1.2 are judged in our sole discretion, to be incompetent or negligent in the provision of the Consultancy Services.

8.2 The Agreement may be cancelled at any time by us for any reason whatsoever, by giving You notice in writing.

8.3 Upon termination, You will be compensated for the Consulting Services actually performed and reimbursed for expenses actually and reasonably or non-cancellable in accordance with the terms hereof.

8.4 Clauses 4, 5, 6, 9, 10, 11 and 12 of this Agreement shall survive the expiration or termination of this Agreement.

**9. DATA PROTECTION**

You consent to us holding and processing, both manually and electronically, any data it collects regarding you for the purpose of administering and managing its business and for compliance with applicable procedures, laws and regulations.

10. **SYSTEMS**

You shall ensure that any deliverables provided to us under this Agreement shall:

10.1    be provided in a mutually agreed electronic format;

10.2    be free from defects, disabling codes, computer viruses, worms, logic bombs, Trojan horses and other information technology contaminants or unauthorised computer code and have been tested to be so; and

10.3    comply and function substantially in accordance with their related user documentation.

11. **GOVERNING LAW AND DISPUTE RESOLUTION**

This Agreement shall be governed in all respects by the laws of the People's Republic of China. All disputes arising out of or in connection with this Agreement shall be settled through friendly consultation between both parties. In case no settlement can be reached, either Party may submit the dispute to the China International Economic and Trade Arbitration Commission ("CIETAC") in Beijing for arbitration in accordance with the CIETAC rules of arbitration then in effect. The arbitration award shall be final and binding on the Parties.

12. **SEVERANCE**

Each clause of this Agreement is a distinct and severable clause and if any clause is deemed illegal, void or unenforceable, the validity, legality, or enforceability of any other clause or portion of this Agreement shall not be affected thereby.

13. **CONFLICT OF INTEREST**

While providing Services under this Agreement you agree that you shall not be engaged in or concerned with either directly or indirectly any other business or profession which either competes with ours or might otherwise cause a conflict of interest without our prior written consent. If in any doubt as to whether a conflict of interest might exist you should immediately discuss the matter with [*Mr. Mark Reilly*] before accepting such position.

14. **WAIVER**

    The failure of a party in any instance to insist on the strict performance of the terms of this Agreement shall not be construed to be a waiver or relinquishment of any of the terms of this Agreement either at the time of the party's failure to insist upon strict performance or at any subsequent time.

15. **ENTIRE AGREEMENT**

15.1 This Agreement constitutes the whole and only agreement between the parties relating to the Services and any previous agreement will be deemed to have terminated. Each party acknowledges that in entering into this Agreement it is not relying upon any pre-contractual statement which is not attached to this Agreement. Except in the case of fraud, no party shall have any right of action against any other party to this Agreement arising out of or in connection with any pre-contractual statement except to the extent that it is repeated in this Agreement.

15.2 For the purposes of this clause, "**pre-contractual statement**" means any draft, agreement, undertaking, representation, warranty, promise, assurance or arrangement of any nature whatsoever, whether or not in writing, relating to the subject matter of this Agreement made or given by any person at any time prior to the date of this Agreement.

16. **FORCE MAJEURE**

16.1 Neither party shall be liable for any delay or failure in performing any of its obligations under this Agreement if the delay or failure results from events or circumstances beyond its reasonable control (including without limitation any acts or restraints of governments or public authorities, war, revolution, riot or civil commotion, acts of God or fire but excluding strikes and lockouts) ("Force Majeure") provided that the party so affected shall send to the other party a written notice within three (3) days of becoming aware of such Force Majeure giving full particulars thereof including the date of first occurrence, the circumstances giving rise to it and an indication of the duration of such circumstances.

16.2    If the period of delay or failure extends for sixty (60) days or more from the date of notification of the Force Majeure event to the other party, either party shall have the right to terminate the Agreement forthwith by written notice.

**17.    LIABILITY**

17.1    You shall not be liable for any loss, damage or delay suffered by us insofar as such loss, damage or delay is directly attributable to instruction given or actions undertaken by us or on our behalf.

17.2    You shall indemnify us, our Affiliates and any servant or agent of ours against:

   17.2.1    any loss or damage caused to any property of ours, our Affiliates or our servants or agents or any physical injury (including injury resulting in death) sustained by any servant or agent of ours by reason of any negligent or wilful act or omission of you at any time during the performance of the Consultancy Services; or

   17.2.2    any claim demand or liability made against or incurred by us, our Affiliates or our servants or agents in respect of:

      (i)    any loss of or damage to any property of yours or injury (including injury resulting in death) sustained by you in the provision of the Consultancy Services unless such loss, damage or injury is caused by the negligent act or omission of us, our Affiliates or any of our servants or agents;

      (ii)    any loss, damage or injury (including injury resulting in death) sustained by any third party in the provision of the Consultancy Services in consequence of any negligence or wilful act or omission of you; or

      (iii)    the receipt or use of any Intellectual Property Rights assigned or licensed to us or any of our Affiliates under Clause 5 which infringes the Intellectual Property Rights of a third party.

If the foregoing terms and conditions are acceptable to you, we would be grateful if you could sign and return the enclosed duplicate copy of this Agreement.

## 18. ANTI-BRIBERY AND CORRUPTION

18.1 You acknowledge that you have received and read the 'Prevention of Corruption – Third Party Guidelines' (either in hard copy in Appendix or at [http://www.gsk.com/policies/Prevention-of-Corruption-Third-Party-Guidelines.pdf](http://www.gsk.com/policies/Prevention-of-Corruption-Third-Party-Guidelines.pdf)) and agree to perform your obligations under the Agreement in accordance with the principles set out therein.

18.2 You shall comply fully at all time with all applicable laws and regulations, including but not limited to applicable anti-corruption laws, of the territory in which you conduct business with GSK.

18.3 You agree that you have not, and covenant that you will not, in connection with the performance of this Agreement, directly or indirectly, make, promise, authorise, ratify or offer to make, or take any act in furtherance of any payment or transfer of anything of value for the purpose of influencing, inducing or rewarding any act, omission or decision to secure an improper advantage; or improperly assisting you or GSK in obtaining or retaining business, or in any way with the purpose or effect of public or commercial bribery.

18.4 You shall not contact, or otherwise meet knowingly meet with any Government Official for the purpose of discussing activities arising out of or in connection with this Agreement, without the prior written approval of GSK and, when requested by GSK, only in the presence of a GSK designated representative.

18.5 For the purpose of this Agreement "Government Official" means: (a) any officer or employee of a government or any department, agency or instrument of a government; (b) any person acting in an official capacity for or on behalf of a government or any department, agency, or instrument of a government; (c) any officer or employee of a company or business owned in whole or part by a government; (d) any officer or employee of a public international organisation such as the World Bank or United Nations; (e) any officer or employee of a political party or any person acting in an official capacity on behalf of a political party; and/or (f) any candidate for political office; who, when such Government Official is acting in an official capacity, or in an official decision making role, has responsibility for performing regulatory inspections, government authorisations or licenses, or otherwise has the capacity to take decisions with the potential to affect GSK business.

18.6 You represent that except as disclosed to GSK in writing prior to the commencement of this Agreement, you have not been convicted of or pleaded guilty to a criminal offence, including one involving fraud or corruption, that you are not now, to the best of your knowledge, the subject of any government investigation for such offenses, and that you are not now listed by any government agency as debarred, suspended, proposed for suspension or debarment, or otherwise ineligible for government programs.

18.7 You represent and warrant that except as disclosed to GSK in writing prior to the commencement of this Agreement: (1) you do not have any interest which directly or indirectly conflicts with your proper and ethical performance of this Agreement; and (2) you shall maintain arm's length relations with all third parties with which you deal for or on behalf of GSK in performance of this Agreement.

18.8 GSK shall have the right during the terms of this Agreement to conduct an investigation and audit of your activities under this Agreement to monitor compliance with the terms of this Agreement. You shall cooperate fully with such investigation or audit, the scope, method, nature and duration of which shall be at the sole reasonable discretion of GSK.

18.9 You shall ensure that all transactions under the Agreement are properly and accurately recorded in all material respects on your books and records and each document upon which entries such books and records are based is complete and accurate in all material respects. You must maintain a system of internal accounting controls reasonably designed to ensure that you maintain no off-the-books accounts.

18.10 You agree that in the event that GSK believes that there has been a possible violation of the terms of this Agreement, GSK may make full disclosure of such belief and related information at any time and for any reason to any competent government bodies and its agencies, and to whomsoever GSK determines in good faith has a legitimate need to know.

18.11 GSK shall be entitled to terminate this Agreement with immediately on written notice to you, if you fail to perform your obligations in accordance with this Clause 18. You shall have no claim against GSK for compensation for any loss of whatever nature by virtue of the termination of this Agreement in accordance with this Clause 18. To the extent (and only to the extent) that the laws of the territory provide for any such compensation to be paid to you upon the termination of this Agreement, you hereby expressly agree (to the extent possible under the laws of the territory) to waive or to repay to GSK any such compensation or indemnity.

**19.     Adverse Event Reporting**

19.1    GSK is required by law to report adverse events associated with GSK products to the relevant authorities. If in the course of providing the Services you receives a report of an adverse event related to a GSK product, you will attempt to obtain the reporter's name and contact details and the name and formulation of the product involved. You will either report the information to a member of GSK staff or to GSK using the contact details set out below within 24 hours. You will inform the reporter that a representative from GSK may contact them to request additional information. If the reporter is a patient or consumer, you will suggest that they should consult their doctor.

For reports of adverse events associated with medicinal products:

Tel: 400-183-3383 or 800-820-3383

19.2 If GSK identifies any reports of adverse events associated with GSK products in materials provided by you for the Consultancy Services, GSK will report such adverse events to the relevant authorities in accordance with its standard procedures. In this case, you agree to co-operate with, and provide further information to, GSK safety staff, within 24 hours, as requested.

Yours faithfully

For and on behalf of

[GLAXOSMITHKLINE (CHINA) INVESTMENT CO., LIMITED]

I agree to the above terms

For ChinaWhys (Shanghai) Consulting Co Ltd

摄连咨询(上海)有限公司

Signed: *(signature)*     Date: 26 April 2013

Name: Mr. Peter Humphrey

# Prevention of Corruption – Third Party Guidelines

The GSK Anti-Bribery and Corruption Policy (POL-GSK-007) requires compliance with the highest ethical standards and all anti-corruption laws applicable in the countries in which GSK (whether through a third party or otherwise) conducts business. POL-GSK-007 requires all GSK employees and any third party acting for or on behalf of GSK to ensure that all dealings with third parties, both in the private and government sectors, are carried out in compliance with all relevant laws and regulations and with the standards of integrity required for all GSK business. GSK values integrity and transparency and has zero tolerance for corrupt activities of any kind, whether committed by GSK employees, officers, or third-parties acting for or on behalf of the GSK.

Corrupt Payments – GSK employees and any third party acting for or on behalf of GSK, shall not, directly or indirectly, promise, authorise, ratify or offer to make or make any "payments" of "anything of value" (as defined in the glossary section) to any individual (or at the request of any individual) including a "government official" (as defined in the glossary section) for the improper purpose of influencing or inducing or as a reward for any act, omission or decision to secure an improper advantage or to improperly assist the company in obtaining or retaining business.

Government Officials – Although GSK´s policy prohibits payments by GSK or third parties acting for or on its behalf to any individual, private or public, as a "quid pro quo" for business, due to the existence of specific anticorruption laws in the countries where we operate, this policy is particularly applicable to "payments" of "anything of value" (as defined in the glossary section), or at the request of, "government officials" (as defined in the glossary section).

Facilitating Payments – For the avoidance of doubt, facilitating payments (otherwise known as "greasing payments" and defined as payments to an individual to secure or expedite the performance of a routine government action by government officials) are no exception to the general rule and therefore prohibited.

**GLOSSARY**

The terms defined herein should be construed broadly to give effect to the letter and spirit of the ABAC Policy. GSK is committed to the highest ethical standards of business

dealings and any acts that create the appearance of promising, offering, giving or authorising payments prohibited by this policy will not be tolerated.

Anything of Value: this term includes cash or cash equivalents, gifts, services, employment offers, loans, travel expenses, entertainment, political contributions, charitable donations, subsidies, per diem payments, sponsorships, honoraria or provision of any other asset, even if nominal in value.

Payments: this term refers to and includes any direct or indirect offers to pay, promises to pay, authorisations of or payments of anything of value.

Government Official shall mean:

- Any officer or employee of a government or any department, agency or instrument of a government;

- Any person acting in an official capacity for or on behalf of a government or any department, agency, or instrument of a government;

- Any officer or employee of a company or business owned in whole or part by a government;

- Any officer or employee of a public international organisation such as the World Bank or United Nations;

- Any officer or employee of a political party or any person acting in an official capacity on behalf of a political party; and/or

- Any candidate for political office



中 慧®™

*Connecting the dots....for businesses in China*

**CLIENT CONFIDENTIAL**

21 April 2013

To: Dr. Mark Reilly, Chairman
GlaxoSmithKline (China) Investment Co Ltd
6th Floor, The Headquarters Building
No. 168 Xizang Middle Road
Shanghai 200001, China

**ChinaWhys (Shanghai) Consulting Co Ltd**
摄连咨询(上海)有限公司
上海南京西路 1168 号
中信泰富广场 35-107 号
邮编: 200041

Dear Mr. Reilly,

**Proposed Investigation – Project Scorpion**

Further to the recent contacts between yourself and ChinaWhys Co Ltd ("ChinaWhys"), I have pleasure in submitting the following proposal for your consideration.

**About ChinaWhys**

ChinaWhys is an independent China-focused risk management practice providing discreet risk mitigation solutions, investigation, consulting and research services to corporate clients in matters of high sensitivity throughout Greater China and Asia. We operate through an extensive and discreet network of associates across China and elsewhere in the region.

We have conducted such services in China on behalf of large, medium and small western multinationals in numerous industries, as well as non-governmental organizations, chambers of commerce, and high wealth individuals.

**Project Name**

This prospective engagement has been codenamed "Project Scorpion".

**Background**

Our understanding of this matter is based on a limited briefing and any error is regretted. We understand that GSK, listed on the London and New York bourses, is one of the leading global health companies involved in research and development of a broad range of innovative medicines and brands. Headquartered in the UK, GSK has offices in more than 115 countries and an extensive manufacturing network around 70 sites globally. In China GSK operates one R&D centre and six manufacturing sites making products in prescription medicines and vaccines. In

addition it also provides products to the China market covering a wide range of therapeutic drugs as well as consumer healthcare products.

Ms. Vivian Shi Wen ("Vivian") was director of central government affairs of GSK China, based in Shanghai. In December 2012, given the findings on her irregular expense claim records, GSK China and Vivian by mutual agreement terminated Vivian's employment contract with the company.

Regardless of the expense claim irregularities, Vivian had been suspected for some time of being the behind-the-scenes author of a smear campaign against GSK stretching over a period of about 14 months and involving at least 23 anonymous letters sent to government agencies around the country and several emails sent to GSK's top management.

The letters alleged that bribery is rife in GSK China sales and that the practice was endorsed by senior management. In response to the allegations, GSK conducted internal investigations but could not substantiate the allegations. GSK believes Vivian orchestrated these attacks on the company but it says it has no direct evidence of this.

In March 2013 an email was sent to GSK's CEO Andrew Witty and five other senior executives in the US and the UK, alleging that GSK China used its travel agent to funnel kickbacks to customers or doctors. In addition, attached to the email was a video recording of GSK China's president Mark Reilly, apparently filmed in his apartment. Security experts believe a camera had been secretly positioned on top of a TV set in his bedroom.

The clip was edited professionally in an effort to disguise the location, but it was obvious to Mark Reilly that the video was shot in his room. It is assumed the camera was installed when Dr. Reilly was away, and it had been removed by the time the email and clip were sent out.

GSK presumes the aim of this incident was to damage Reilly's reputation irretrievably and to prompt GSK to fire him. GSK reported the incident to local Chinese police (PSB) and Reilly relocated to a more secure residence with a surveillance camera fitted over his apartment door.

His travel schedule is widely known at the company, and it is assumed that someone must have leaked his schedule to Vivian or her accomplices or to some author of the incident.

GSK is concerned that Vivian may have local PSB contacts who could have helped to plant the camera in Reilly's room. It is also possible that she hired private investigators to do it.

Vivian is said to be very close to officials of the State Food and Drug Administration (SFDA) in Shanghai, the government agency which regulates pharmaceutical companies.

She is said to be married, with one daughter, and her husband is said to work for a university.

Since her departure from GSK, she is said to have been seeking employment with multinational pharmaceutical or health product manufacturers – without success up to date.

Vivian is said to be strongly disliked by her former GSK colleagues. Most people who used to work with her left the company.

In order to improve its understanding of the matter and in the interest of defending its reputation, GSK wishes to conduct a discreet information search into Vivian, her activities, track record with previous employers, and her political influence, to assess the potential risks that her activities may pose to GSK, and to gather any available evidence that Vivian orchestrated the smear campaign against GSK and Dr. Reilly.

**Objective**

The objective of Project Scorpion is to assist GSK to mitigate the risks associated with the smear campaign through discreet investigative actions addressing the focal issues listed above.

**Proposed Course of Action**

Based on the facts presented to us by GSK, it is now proposed to proceed as follows.

- ■ *Collection and review of client information*

Before we commence our investigation, GSK will provide us with all necessary start-up information required to facilitate well-focused and economical inquiries, including:

- Full identifiers of Vivian Shi, including her full names in Chinese and English, CVs, HR data forms, ID number, copy of ID card, copy of business card, all known addresses, all known phone numbers, all known email addresses, all known social media platforms that she belongs to, copy of employment contract, recent photo, details of any known family members (possibly to be found in the emergency contacts section of her HR file), etc, to the best knowledge of GSK, if there is any.
- Details of employees who have worked with Vivian and the org chart which specifies the positions of these employees, and their contact details.
- Copies of any allegation emails in GSK's possession. Any such emails should be provided in the form of detached eml files in their original format so that we can attempt a trace analysis on them.
- A copy of Vivian's profile from *Weibo*, mentioned by GSK in our briefing.
- Names of SFDA officials with whom Vivian is known to be close and any other government agencies that Vivian was routinely in contact with in the course of her work.
- Full address of Mark Reilly's former residence where the camera was installed. Details of landlord. Details of building management and security department there.
- Any additional anecdotal or 'hearsay' information about the activities of the suspects and related entities and associates.

- **Phase 1 Investigation**

Once the information is received, we will thoroughly review the above start-up information and then initiate inquiries into Vivian and her contacts.

- Our analysts will conduct thorough desktop research in Chinese and English comprising searches of public and private online electronic resources, business databases, especially Chinese-language sources, on Vivian in order to gather all information about her that is available in open sources without alerting her, to build a profile and explore her social network, and to develop leads for our inquiries.

- We will aim to identify the security service firm which provides guard services to Reilly's former residence building and learn whether it has kept any CCTV security film from the period when the illicit video was shot (believed to be the first week of March 2013).

- We will conduct discreet inquiries with official agencies and knowledgeable contacts into Vivian and her family members in an effort to ascertain the strength of any political and governmental connections they may have.

- We will identify sources close to Vivian from her various past employments and discreetly approach them to gather further information about Vivian's connections with government and SFDA hierarchies, and to gather additional information about her personal behaviour, track record and past departures from employers.

- We will discreetly approach knowledgeable sources within the government and SFDA to obtain their view on the strength of any ties that Vivian could potentially use to harm GSK.

- We will also discreetly inquire into whether Vivian has close contacts with the Shanghai PSB, and whether it is possible that such PSB contacts could have helped to bug Reilly's apartment with the hidden camera.

- As far as is this is safely and technically possible, our contacts will be recorded.

- When conducting the above search and inquiry, we will use our best efforts to ensure that such actions will not alert Vivian or pose any harm to the GSK's decent relationship with government agencies.

- Upon completion of our inquiries we will provide a report containing our findings and any collected evidence.

***Potential Optional Follow-Up Phases***

While we always endeavor to complete such investigations as far as possible in a single round of inquiries, there are occasions when additional phases of inquiry or additional actions may be required in order close the loop on a complex matter. If required by GSK, such additional actions in this matter could potentially include some of the following:

- E-review of workplace PC and email data to search for additional leads and evidence.

- Orchestration of surveillance actions to identify activities and affiliations of the subject.
- Drill-down inquiries on particular parties and issues identified in the course of Phase 1.
- Related discreet inquiries in additional jurisdictions based on leads uncovered in Phase 1.
- Internal investigation comprising interviews with GSK personnel.

The scope and costs of any such additional actions would be negotiated and agreed with GSK separately from the Phase 1 outlined above, before any such additional actions are initiated.

### Caveat: Information Restrictions

Please note that China has been undergoing a political leadership change this year and this is a period of political tension, with a tightening of control over information flow. We have seen sudden swings and arbitrary regulatory restrictions on the availability of certain documentary data in recent months such as company registration details and ownership, financials and other details, and personal data, in certain parts of the country. The nature, location, scope and timing of such regulatory restrictions when they occur are unpredictable. We would make our best efforts to complete the assignment by gathering all available information through legal means.

### Utilization of Findings

Our findings are exclusively for the use of GSK and its legal advisers in assessing and mitigating business risk and not for publication or distribution to any other third party. Should GSK wish to use our findings in any legal proceedings, this could require additional work in collaboration with your legal counsel to package any leally admissible material for evidentiary purposes. The ChinaWhys name may not be revealed to third parties without our prior written consent, which will not be unreasonably withheld and which will be based upon our assessment of security risks posed to ChinaWhys and its personnel.

### Project Fees

For Phase 1 of this investigation we will require a professional fee of RMB 220,000.

Our professional fees are quoted exclusive of PRC VAT, which will be applied to our invoices.

In addition to our professional fees, reasonable disbursements for travel, accommodation, registry and database charges, duty meals, etc, will be charged at cost. These out-of-pockets will not exceed the equivalent of 15% of our professional fees.

The fees for any subsequent phases or actions would be negotiated separately based on the scope of work anticipated.

### Conduct of the Assignment

As information develops in the course of the project, new leads of inquiry may be identified in new jurisdictions or directions requiring additional work to be carried out. We will review such information with you to determine its relevance to the objectives and to assess whether any such new work should be conducted and further budget allocated. Any additional phase of the project would be defined and agreed in writing through these discussions.

**Reporting**

Upon completion of Phase 1, a report will be submitted to you. Before its submission any significant information that emerges during our inquiries will be communicated to you promptly. We estimate a completion period for Phase 1 of four working weeks. (The upcoming May Day public holiday in mainland China will interrupt our work for several days.)

**Non-Solicitation**

For a period of two years from the signing of this letter GSK shall not solicit, offer employment, hire, or offer assignments directly or indirectly to any employee or subcontractor or supplier of ChinaWhys, without the prior written consent of ChinaWhys. Also, GSK shall not attempt to entice, lure away or refer directly or indirectly any employee or subcontractor or supplier of ChinaWhys to any other third party.

**Terms of Business**

Other working conditions are as stated in the Consultancy Agreement between GSK and us (attached).

**Acceptance**

We much look forward to cooperating with you on this important project. Should the issues and terms set out in this proposal be acceptable, would you please sign and return a copy of this letter. We will be available to start work on receipt of payment of the invoice for the retainer fee.

Thank you for the opportunity to be of service to Client. If you would like to further clarify any of the matters raised in this document please contact me. We look forward to hearing from you at your convenience.

Yours sincerely,                                                  Proposal has been accepted by:

*[signature]*

Mr. Peter Humphrey                                                Signature:
Managing Director,
ChinaWhys                                                         NAME:

                                                                  Title: